Next case is 5-18-0139, and we're going to do the Workers' Compensation Commission. Counselor, you may proceed. Good afternoon, Your Honor. My name is Jacob Caddy. I work as an administrative officer in this case, and when we were here, the court has asked to review the decision of the commission by the metrics weight of the evidence standard. The primary issue here is, frankly, identifying the difference between whether or not an accident occurred and whether or not an accident was true. And the decision of the commission offers a legal and logical factual issue that we'll discuss today. First, just a brief procedural. This case was tried March 16, 2015, on a 19B. The petitioner, Mr. Holmes, was diagnosed with a disc herniation at L5S1, an annular tear at L5S1, a central herniation at L045, and some smaller herniations in the cervical spine. But the 19B was for the fusion at L5S1 and disc replacement at L045. Now, the date of accident that was alleged by Mr. Holmes was September 23, 2015. And I think it's important to identify exactly the circumstances, not only with respect to mechanism of injury, but with respect to the parties. Before you get too far into that, which, of course, your title will make the argument, what do we do with the finding that the claimant's testimony was incredible and unsupported by the record? So how do we just overlook that unusual conclusion? We absolutely do not overlook that conclusion, Justice Hudson. In fact, that is the central point of my argument. And I believe that the case law, specifically, pardon me if I mispronounce it, SCIMEA or SCIMEA, stands for the proposition that if the commission's decision is flawed, then it will be against the manifesto of the evidence. Well, it depends on how it's flawed. Go ahead. That is true, Your Honor. But we're going to examine exactly why it's flawed and how it's flawed. Okay, but touch on the credibility. With respect to the credibility, the allegation or the petition, Mr. Holmes makes the assertion that he was injured on September 23. He reported the accident, and that report wasn't taken. But the parties agree and stipulate to notice as it pertains to the statute. So we have statutory notice and, again, not an injury. He saw medical treatment, ultimately diagnosed with an annular tear in L4-5 and cranial injury in L5-S1, and surgery was recommended. Now, between September and the trial, approximately six months later, we sent the case for a 19-B initially in November. We rescinded it because we were told the case was under investigation. But when the case was finally referred to counsel in Illinois, the case would ultimately continue for reasons that I've discussed in my brief. And it was ultimately tried in March of 2016. But it is important to remember exactly why we waited until March of 2016. Because in December, counsel had understandably just received the file and wanted to investigate it a little further. Now, with respect to proving accident, International Harvester tells us that proving a prior condition of well-being and a subsequent condition of ill-being is enough to establish that an accident occurred. It's not enough to establish that an accident occurred arising out of a course of employment, but it's enough to establish that an accident occurred. And that's the first case that we will cite to support our assertion that the patient met his burden in this case. Establishing what issue? Establishing what issue? He met his burden of establishing what issue? That he credibly testified that an accident took place on September 23, 2015. Now, that specific element, that the petitioner was not credible, is based on several presuppositions by the respondent that are not supported by the record, nor do they conform with reasonable inference, and are simply not reliable. Well, let me ask you this, so it gets down to whether or not the accident caused the claimant's condition of well-being. The commission determined that even though the claimant testified that he experienced immediate pain, it worsened following the accident. The claimant worked full duty for seven days before he sought medical treatment, and he would have to lift up to 50 pounds for half the day and stand 90% of the day. The commission doubted that he was injured because of that. And I understand that. What do we make of that? Well, Your Honor, first it's important to identify exactly what the commission is saying. And in order to identify exactly what the commission is saying, you start with the arbitrator's decision, because the commission's exact statement was that they adopted and affirmed the arbitrator's statement. And the arbitrator adopted and affirmed verbatim the proposed decision, which, again, is well within her right. The proposed decision was set forth by the respondent. So in order to look at the context of what the commission is actually referring to, I believe it is informative to understand exactly what the commission is saying. Well, I know what you're saying. I think you're sidestepping the issue. Is it true that even though he testified he had immediate pain, he continued to work full duty without problem for seven days before he sought medical treatment? That's a yes or no answer. No, it's not, Your Honor, because it's partially yes and partially no. Okay, well, tell me what the yes and the no is. Break it down. So the petitioner admits he did work full duty without restrictions. For seven straight days, right? For seven straight days. Well, I believe he was operated. Correct. Correct. He did work full duty without restrictions. However, the primary issue isn't whether or not he worked full duty. The issue is whether or not he worked and he was in pain. Your Honor, the only testimony that we have with respect to whether or not he was working without issue or working without pain, we have conflicting evidence from both the petitioner, Mr. Holmes, and respondents' witnesses, Chris Chandler and Don Schechtner, both of whom proved to be incredible and both of whom were impeached on the record. Who found they were incredible? The commission or was that just your allegation? Your Honor, I don't believe I need to make an allegation. I believe you can examine the transcript, and the transcript will clearly establish that they made statements that they later recanted or were proven to be inaccurate. Right, but you would have to concede as an experienced practitioner that is within the commission's purview to judge the credibility of the witnesses in their way. Now, they opined specifically on the claimant's credibility, and you've made a valiant attempt to explain that. But did they ever say that the people you're saying, Chandler, Schneider, and Dalton, were not credible? Did they make that finding? No, Your Honor. You're making that inference that they weren't, but that's not the commission's decision. Your Honor, with all due respect, not only am I making that inference, but I'm presenting the way that the evidence has proved that they are not credible. Right, but again, I want to pin you down. Did the commission find that they were not credible? Let's start from that point. The commission found that they were credible based on the proposed decision that the arbitrator ultimately affirmed and adopted, and the commission affirmed and adopted. You know, we understand that the commission looks at issues of credibility to know, well, they're not bound by what the arbitrator states. True. However, there is an underlying fact that we cannot escape, and that is that the arbitrator listens to that testimony, watches the testimony being given, and examines the petitioner as he or she testifies. Your Honor, at the risk of speaking without the depth of evidence behind me, I would suggest that the confirmation rate between the commission decisions, the percentage of decisions affirmed and adopted by the commission, would, at a minimum, suggest that there isn't a level of evidence that is given to the arbitrator who witnesses the testimony being given. And I also think it's important that the arbitrator did not weigh in beyond that which was presented to her by the respondent. Again, well within her right, and that is something that we need to recognize. But I also think it's difficult to draw the conclusion that the commission reached any conclusion aside from affirming and adopting that the petitioner failed to meet his burden that an accident took place. That's the central issue, Your Honor. Because Hostin, Hostenzie, Hostin. Hostinick. Hostinick, pardon me, Your Honor. Hostinick tells us that an unwitnessed accident is enough to establish the presence of an accident. Now in that case, there are four factors that you could apply similarly, Your Honor. Wait a minute, wait a minute. It's not sufficient to establish an accident if the commission says they don't believe him. And if they have reasons for not believing him. In this particular case, it's an unwitnessed accident. A guy who claims he had an unobstructed view for all but 10% of the time said he saw no accident. There isn't a single witness to corroborate his testimony that there was an accident. He worked for seven days with this horrible pain, and two witnesses said they never witnessed him exhibiting any incidence of pain during those seven days. And so the commission said, we don't believe you. And so if they don't believe him, and there's no basis upon which you can contend that they had no reason not to believe him, then in that particular case, he didn't prove the accident. Your Honor, I would agree with you. However, the reason why I disagree with you is both factual and legal. First, we know that if the commission's decision, in this case, they're finding that the petitioner was not credible. If that is flawed, then it must be. So why is it flawed? It's flawed because it's not based on facts. Hold on a second. Is it not a fact that he worked for seven days with no complaint of pain to anyone at work other than his testimony complained, and two witnesses said they watched him work. This man didn't exhibit any incidence of pain. Your Honor, no. It is not a fact. And let me explain. This is similar to what I mentioned to Justice earlier. It is unrebutted. It is without Mr. Holmes' stipulation that he worked for seven days. However, what is a critical point of contention is whether or not he made a run. He mentioned that he was in pain. And when you're looking at the two witnesses that testified that he was not in pain, we're talking about Don Schechter and Chris Chandler. We'll start with the latter. Chris Chandler testified that he himself had a work accident, and not all accidents were reported. Not all accidents generated an accident report. And this is the same reporting requirement that was cited by the defiant sacrosanct to show and establish the presence of an accident. So with all due respect, Your Honor, when you say is it a fact that he made no complaints, Your Honor, it is not. Is it a fact he worked seven days before seeking medical treatment? Absolutely. But this is a man that was allegedly crushed by a 20,000-pound object? Well, a slight little clarification, Your Honor. The bundle was coming at him, and he was, in order to avoid it, pushed against it, hitting himself against the railing, and slid under. Did anyone see the accident? No, Your Honor. Nobody saw the accident. No one saw the accident. However, it was described as the bundle was coming towards him at a snail's pace also. So it's not like he had to take quick and easy action to remove himself from danger. That's right, Your Honor. According to the testimony of the other employees. And, Your Honor, with respect to the speed by which the bundle was traveling, that's relevant in that it's enough to cause the accident that Mr. Holmes testified to. If that bundle was moving any faster, we wouldn't be talking about a couple herniations or an angular tear. We'd be talking about a death case, Your Honor. Wasn't there also testimony that this had tie lines on it? Yes, Your Honor. In fact, Mr. Holmes and another spotter were suspended, standing on a platform 10 feet above the ground. And by the testimony of Mr. Jacob Rucker, it would be required to manhandle these bundles in the position. And, Your Honor, that's a critical point as well, Your Honor, because when you're talking about an accident, an unwitnessed accident matters if that accident should have been witnessed. It is inescapable that that event would have been seen. Your Honor, I can't... Wait a minute. If the event ever took place, what did Chandler say? He said the employees were always in his eyesight of each other, never observed an accident on September the 23rd. What's his name? Schitzer? Schitzer, Your Honor. Yeah. His testimony was present watching the crew members, never witnessed any accident or injury on September the 23rd. Now, why couldn't the Commission believe that? Because they lied under oath, Your Honor. Wait a minute. Hold on a second. Who said they lied? Did the Commission say they lied? Your Honor, Rucker could have established that they lied. Wait a minute. Tell me why they lied. Well, for example, Your Honor. They didn't lie if your client lied. They were telling the truth. No, Your Honor, with all due respect. Why? Irrespective of what part of the testimony pertains to the mechanism of injury, we had established on the record that they had lied under oath. Why? How? What did they lie about? Specifically, Dr. Chick Schneider lied about calling Mr. Holmes' fiancée shortly after the accident. Now, obviously we cannot establish what happened or what the conversation was in that, when the phone calls were made. But he testified under oath that those phone calls were never made. And he repented that testimony when presented with the phone records. Yeah. Does that mean he lied about not seeing an accident? That does not mean he didn't. That does not mean he lied about seeing an accident. But what it does prove, Your Honor, is that he lied once under oath. The Commission knew that, didn't they? They should have known. Well, did they? Did he testify to that? Did he repent on the record? They did testify. Then they knew he repented. Correct, Your Honor. And they didn't believe him on whether, they didn't disbelieve him on the question of whether he failed to see an accident. And that's precisely why the decision of the Commission was flawed. Because they put undue weight on evidence that was, they put undue weight on evidence that should have been ignored, sir, and they completely ignored evidence that supported an opposite conclusion. And that was that the testimony provided by Don Scheck Schneider and the testimony provided by Chris Schengler was simply not reliable. Now, how did Schengler lie? What's the basis for your saying he lied? Well, Everybody lied but your client, I guess. Is that what happened? Well, Your Honor, I don't, you don't have to believe my client. We have to believe him on the accident. What the record establishes, Your Honor, is that there was no prior condition that showed herniation, herniation L4-5 or conangular tear L5-S1. There's absolutely no evidence to the fact that opposing counsel requested the authorization form which was provided to him in December of 2015. I hate to interrupt you, but I shall. Your time has been up for a little bit. You will have five minutes to reply, and you can finish that during your reply. Thank you. Okay, thank you. May I please report? My name is William Looker-Jones. I'm here for the reading of this case. Can I ask you a question to get your focus here? Maybe it's irrelevant or not. Absolutely. Okay. As I understand it, a crane is lowering this equipment that's going to be bolted together with 27-some bolts. They're lining it up supposedly. There's two people with a tie line down on the ground, correct? Yes. And claimant is up on scaffolding. Is that right? I believe there's boilermakers all around. Okay, right. There's presumably an operating engineer in charge of the crane? I believe so. Okay. So who is down there with the tie lines to keep this thing from swinging against the boilermakers? Well, supposedly Mr. Holmes being one of the boilermakers would be one of those people. Mr. Chamberlain is one of those. But Holmes was holding the tie line? He would have been one of the people as the boilermaker. I believe. I don't know exactly. No, no. Stay with my picture here. We have down at the ground two people with tie lines to keep this thing from swinging, right? To hit the boilermakers, right? That are up there ready with a spanner to line up the holes and put the bolts in and wrench them in. The one thing I'll clarify is that crane is what moves it into place. Of course it does. That's why I asked about the operating engineer. Yes. Did he testify? Yes. Mr. Rutherford, he was the one who operated it. What did he say? He said he never saw it. He was the one that Judge Hutchinson referred to as the one who saw it. Who were the guys holding the tie line? I'm trying to get you to get simple on this. Mr. Chandler was one of the ones. He testified that he didn't see it. And he was holding the line? He would have been one of the people. Okay. He tried to hold that to line it up. Yes. So essentially, Judge, I mean, that is what the question is as to appellate charges predicated on the credibility of the witnesses. And that inherently is a question of fact, which again, as the court has recognized over and over again, will not be overturned unless it's against the jurisdiction of the evidence. In taking that into consideration, the question isn't necessarily whether or not you may disagree or I may disagree, unless the panel disagrees with the findings of the commission, but rather if there was sufficient evidence to support those findings that were made in the commission. And to do that, we can look at the controversial evidence. Mr. Holmes claims a pretty serious accident where a significant piece of equipment that weighs a lot, that at least is the size of a desk, if not larger, is coming toward them. His testimony was that it was coming toward them rather quickly. It was off balance, coming at him in a little awkward manner, and he tried to push it away and then to avoid getting crushed, slumped under, and in the process hurt his neck. Again, he claimed that an individual named Richard was a witness. Richard didn't testify. He claimed that he reported to an individual or told an individual named Colby about this accident. That individual didn't testify. He claimed that he made a union grievance and told the union about it. No testimony from the union that corroborated that. Instead, there were three witnesses that directly contradicted what Mr. Holmes had claimed. There was Mr. Rucker, the crane operator, who testified that everything was within his line of sight except 10% of the time it was kind of their hand signals that directed him. If something like that happened, he would have seen it. And, in fact, he testified while this piece of equipment was being moved into place. No one would be standing in the position that Mr. Holmes claims he's standing at. And Mr. Rucker testified that when this channel head moves into place, it's moving at a snail's pace or a turtle's pace. That was supported by Mr. Shecksteiner, who was a supervisor, who was down on the ground, and he supervised it and testified. He always kept his eye on what was going on while this channel head was moved into place to ensure that everything was done properly and that safety was observed. Mr. Chandler testified, as one of these other oil makers, that these employees were all within line of sight of each other, and if something like that happened, someone would have witnessed this. And, you know, to Mr. Caddy's point about the injury that he claims was not reported that was suffered by Mr. Chandler, that was essentially, as Mr. Chandler testified, a bloody lift. He refused medical treatment. He didn't think it was significant. And he also testified that if he thought so, then he would have gone over Mr. Shecksteiner's head if Mr. Shecksteiner refused to report it and gone directly to the safety coordinator. So, you know, if we just look at the witness testimony, again, the question of credibility is decided by the commissioner. You and I may disagree, but this court is in text with re-weighing that credibility. Essentially, the task of this court is to determine whether or not there is sufficient evidence to support the commission's findings regarding credibility. But also, you know, if you look at some of the other evidence that was presented, it also contradicts Mr. Hull's original defense. First of all, he claims that he was in significant pain to the point, stating a couple days later, his right leg essentially stopped working. Mr. Holmes, and he complained about significant problems, washing his hair, lifting his arms and his shoulder. His fiancee testified, who said that she had traveled up to Missouri or up to this court site with Mr. Holmes and was staying with him. She never testified attending this. She never corroborated any of the complaints. Not to mention, as Judge Hoffman just pointed out, that the people that he worked with also testified that he exhibited no such complaints or symptoms at work. This was a heavy-duty job. It was not until after he had a conflict with a co-worker, it was not until after he met with an attorney and went to a doctor that he was directed to buy his insurance, that suddenly these complaints came to light and this report of injury was made. Now, again, the question is whether or not I agree or you agree with what the Commission found regarding that testimony and how it affects Mr. Holmes' credibility. But I certainly wouldn't say that that is sufficient evidence that would support the findings of the Commission in questioning the version of complaints that were reported by Mr. Holmes and supporting the questions on credibility that they found within his testimony. So, again, Your Honors, the substantial amount of evidence that was presented in this case certainly can present two points of views. But, again, when we look at the standard that this Court has justified, we only need to look at whether or not the Commission's findings are supported by sufficient evidence. And based on all the controversial evidence that was presented, based on the detailed findings of the arbitrator that were unanimously affirmed by the Commission, I certainly say that there was more than sufficient evidence to support the Commission's findings, and I respectfully ask that this Court rule if they were to affirm the findings of the Commission in this case. Thank you. Thank you, Counsel. Counsel, you may be replied. With all due respect, Mr. Chief Justice, this is not a question of point of view. This is a question before the appellate court to determine whether or not we're going to look at quality of evidence or quantity of evidence. And what we're looking, in order to determine whether we have quality or quantity of evidence, let's examine the claims and understand an underlying logical truth, and that is called, as you mentioned, the absence of evidence does not signify the evidence of absence. Here's what I mean. In order to explain this, I warned Counsel about this earlier. We're going to talk about the invisible gorilla. In 2010 or 2011, a couple of gentlemen by the name of Simon and Chavis conducted an experiment where there were six people in a room, three of whom were wearing white shirts, three of whom were wearing brown shirts, and the audience is asked to count the number of times that people in white shirts bounced the ball to each other. And they count. And they said, how many times did they bounce? Twelve. All right, good job, you got that right. Now, what color was the shirt that the gorilla was wearing? And everyone looks at them confused. They played the tape again, and sure enough, here comes a gorilla wearing a blue shirt or whatever it was, walking right in the middle of the screen, beating his chest, and it shows. They wrote a book with respect to it. They touched on cognitive dissonance, they touched on several issues, but the importance, the takeaway here was, when you're focused on one thing, it is easy to miss a gorilla in the room when it's plain as day, when you're looking for it. Okay, so what's the gorilla here? The gorilla here, everyone's, no one's looking at Mr. Holmes, everyone's looking at the bundle. When Mr. Rucker is wielding that bundle on that crane, and he's trying to get it into place, he's not looking at Mr. Holmes. Mr. Schechtheimer, I'm sorry, but there's a shred of his testimony, whether it's with respect to the reporting requirement where even, quote, near misses would be reported. And evidence that was submitted by the respondent shows that that accident that Mr. Chandler testified to where he bladed his lip, that was dated October 1st, the same day my client was fired for reporting an accident. How did he report that accident? Not only by going over Mr. Schechtheimer's head and talking directly to Grant Dalton. He called Phillips 66 directly. And it was after he called Phillips 66 that he was spied. Don't they state that he was fired for filing a false accident report? You're absolutely right, Judge Barbaros. The question that I have for you is the same question that Judge Chapman asked me, and that is, why would you fire him if you say an accident never happened? Well, just a final question to follow up on your interesting exercise. Assuming that people were confused and they didn't see anything, how does that help you? Because ultimately in all of these cases, the claimant has the ultimate burden of proof. Absolutely. And if the commission simply doesn't believe the claimant with no other evidence, how does the claimant win? Absolutely, Your Honor. The way the claimant wins is by establishing that an unwitnessed accident occurred. If they believe him, though. You're ignoring that condition. If they don't believe him, it doesn't matter if it's unwitnessed. With all due respect, Your Honor, I'm not ignoring the fact. I'm getting to it. Okay, good. An unwitnessed accident is testified. There is absolutely no contrary evidence. And the way we get around whether or not the commission believes him is by examining whether or not that belief is flawed. The evidence shows that belief was flawed. Horribly flawed. But the question is whether or not there was sufficient evidence for the commission to make its finding. And that evidence? The answer is emphatically no, Your Honor. Emphatically. Because there's not a single shred of objective evidence. We're talking about conjecture. Conjecture that's not supported by facts nor reasonable evidence. It's only your conjecture. Rucker testified he saw nothing. And he was capable of seeing this man for all the 10% of the time. Chandler says he saw nothing. Chandler testifies, and someone else testifies, this guy works for seven days without exhibiting any pain whatsoever. He gets discharged on the 29th of September. The 30th of September. He runs to a lawyer on the 30th, and the lawyer sends him to a chiropractor. And the commission says, we don't buy it. We don't buy this. Your Honor, I respectfully disagree. Well, I know you disagree, but the fact of the matter is, don't start saying there's no evidence in the record to support the decisions. Your Honor, the evidence on the record needs to be supported by the facts that The account that Your Honor is explaining is predicated and is entirely reliant on certain presuppositions that when examined in comparison to the record, lie in direct contradiction, Your Honor. Lie in direct contradiction to your client's testimony. That's true. Respectfully, Your Honor, that's not true. Here's what we know in taking away all other disputed facts. We have an altercation that takes place approximately five days after the alleged date of accident. Again, we know an altercation took place. We know shortly thereafter, my client who worked the night shift, clocked in at nine o'clock in the morning to speak with the supervisor above his direct supervisor's head, and was fired on October 1, 2015. Yes, after he came to my office. He said, you need to go to a doctor. You need to tell your employer. I know you're telling me they're not writing a report. You need to tell them anyway. So my client didn't take no for an answer. He got fired because of it. We also know that he was then examined, and the objective unrebutted medical evidence shows that there's an injury here. You're pretty good at Latin, aren't you? Do you know what Post-October Proctor Act is? I have some idea. After this, because of this, it's been false logic since the days of Aristotle. I understand that, Your Honor, but with all due respect, that is not what I'm presenting. Well, if you're saying that because he exhibited an injury on October 1st, therefore it had to have happened on September 23rd, that's illogical. You're right. That assertion, Your Honor, that assertion, absent contrary evidence, contrary evidence, not heading to say, oh, it didn't happen, because when we're looking at whether or not this happened, we're talking about documentation. We're talking about testimony that the respondent entirely controlled. We're talking about testimony that comes from a source. Did your client testify there were some witnesses to this accident? Your Honor, there was, and I called Mr. Holger Newman, who I believe was, pardon me if I mix these up, one of whom was invasive training and unavailable. The other, a Louisiana gentleman, I was not able to get into time to draw, Your Honor. Okay, your time is up. Thank you both for your fine arguments in this matter. It will be taken under advisement, and we have a disposition over it.